FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 22 2018

JAMES N. HATTEN, Clerk
By: ⟨signature⟩ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

2:18-CV-0201

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* JAMIE DOUGHERTY, <br><br> Plaintiff, <br><br> v. <br><br> BACK IN THE GAME PHYSICAL THERAPY, INC., BRENDON BLAKE, AND GINA R. BLAKE, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

On behalf of the United States of America and the State of Georgia, Plaintiff-Relator Jamie Dougherty ("Relator"), by and through counsel, files this *qui tam* Complaint against Defendants Back In The Game Physical Therapy, Inc. ("BITG"), Brendon Blake, and Gina R. Blake (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1.     This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Georgia (together, the "Government") from Defendants for knowingly and/or recklessly presenting or

causing to be presented false claims to the Government in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.* ("Georgia FMCA"), and applicable regulatory and ethical guidance.

2.      The illegal acts alleged herein were personally witnessed starting in 2012, although such fraudulent practices likely began earlier, and continue through the present ("Covered Period").

3.      Defendant BITG is an orthopedic physical therapy practice with two offices located in Georgia, offering various physical therapy services, including, but not limited to, manual therapy, dry needling, kinesio taping, ultrasound/phonophoresis, laser therapy, sport specific rehabilitation/training, orthopedic/post-surgical rehabilitation, and aquatic physical therapy.

4.      Defendants Brendon and Gina Blake are a married couple. They established BITG in November, 2011, and are co-owners.

5.      Throughout their operation of BITG, Defendants have committed various types of fraud against the Medicare, Medicaid, and Tricare Programs (collectively, "Government Programs"). These types of fraud include billing for services not rendered, upcoding for services provided, and billing the Government for services provided by unqualified personnel.

6.     As a result of these improper billing procedures, numerous false claims were submitted to Government Programs. Defendants' schemes caused Government Programs to pay reimbursements for services that would not have been made but for Defendants' illegal billing practices, and which are specifically prohibited by federal and state law, regulations, and policies.

7.     Defendants have actual knowledge that they are engaging in illegal misconduct, including knowledge that the reimbursements sought are not entitled to payment and that improperly obtained payments must be refunded to the Government.   Defendants have chosen to profit from fraudulently billing Government Programs instead of disclosing the true nature and extent of the services they provide.

## PARTIES

8.     Plaintiff Relator is an individual and citizen of the United States of America and the State of Georgia, currently residing at 5705 Grand Reunion Dr., Hoschton, Georgia.  Relator worked at BITG from May, 2012, to September 4, 2017, as the Business Operations Manager.  During that time, Relator personally witnessed and gained direct and independent knowledge of the information on which the below allegations are based, and Relator herein voluntarily discloses such information to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i).  To

the extent any of Relator's allegations have been publicly disclosed as contemplated by 31 U.S.C. § 3730(e)(4)(A), Relator's knowledge is independent of and materially adds to those allegations pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii). Relator seeks to recover for the benefit of the United States and the State of Georgia all appropriate damages, civil penalties, interest, costs, and fees arising from Defendants' violations of the FCA and Georgia FMCA.

9.      Defendant BITG is a Georgia corporation with its main office located at 4754 Martin Rd., Suite 200, Flowery Branch, GA 30542, and a secondary office located at 2300 Liam Ave., Suite 104, Dacula, GA 30019.[1]  Defendant BITG transacts business in the state of Georgia by offering and providing physical therapy services.

10.     Defendant Brendon Blake is a licensed physical therapist in Georgia (License No. 007433) and is co-owner of BITG.

11.     Defendant Gina Blake is a licensed physical therapist in Georgia (License No. 007434) and is co-owner of BITG.

---

[1] During Relator's employment, Defendant BITG maintained a third branch in Gainesville, Georgia at the Smoky Springs Adult Living Facility for a short period of time.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over Relator's claims.  The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. § 3732 and otherwise have jurisdiction over federal statutory causes of action under 28 U.S.C. §§ 1331 and 1345.  This Court has supplemental jurisdiction over Relator's state statutory and common law claims pursuant to 28 U.S.C. § 1367.

13.    Supplemental jurisdiction for counts related to the Georgia FMCA arises under 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  In addition, 31 U.S.C. § 3732(b) provides jurisdiction for "any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730."  The state claims at issue here arise out of the same transaction or occurrence as the federal claims.

14.    At all relevant times, Defendants conducted regular, substantial business in the United States, including the State of Georgia.  Accordingly, Defendants are properly subject to personal jurisdiction in the State of Georgia generally, and this Court specifically.

15.     Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (2).  Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred."  The acts complained of herein occurred in the State of Georgia and within the geographic area encompassed by the United States District Court for the Northern District of Georgia.

16.     Under both the FCA and the Georgia FMCA, this Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

## STATUTORY SCHEME
### Government-Funded Health Programs

17.     The Medicare Program is a federal government-funded medical assistance program, primarily benefiting the elderly and disabled, which was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter, "Medicare").  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by taxpayer revenue.  Medicare was designed to be a health insurance program and

to provide for the payment of hospital services, medical services, and durable medical equipment to persons older than 65 years of age and others who qualify under its terms. Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, Medicare Part D extended prescription drug coverage to all Medicare-eligible persons who elect to participate.

18.    Enrolled providers and suppliers of medical services to Medicare recipients are eligible for government reimbursement for covered medical services and must agree to abide by the rules, regulations, policies, and procedures governing claims for payment in order to receive such reimbursement.

19.    Before participating in government-funded healthcare programs, Defendant BITG and other such providers are required to certify compliance with Medicare's rules and regulations. Thereafter, each time Defendant BITG or any other such provider submits a claim for payment, it is required to recertify its continued compliance.

20.    When enrolling with Medicare, a provider must sign an initial enrollment application and periodically submit new applications as part of the revalidation process. Certification Statement, Sec. 5, CMS Form 855, Medicare Enrollment    Application,    Institutional    Providers,    *available    at* https://www.cms.gov/Medicare/CMS-Forms/CMS-

Forms/downloads/cms855a.pdf.    As part of its agreement with Medicare, a

provider certifies the following:

> I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction
> complying with such laws, regulations, and program
> instructions . . . , and on the provider's compliance with all
> applicable conditions of participation in Medicare.
>
>     \*   \*   \*
>
> I will not knowingly present or cause to be presented a false or
> fraudulent claim for payment by Medicare, and I will not
> submit claims with deliberate ignorance or reckless disregard of
> their truth or falsity.

*Id.*

21.    After its initial certification, a provider has an ongoing duty to notify

Medicare if anything on the form becomes untrue or inaccurate:

> If I become aware that any information in this application is not
> true, correct, or complete, I agree to notify the Medicare fee-
> for-service contractor of this fact in accordance with the time
> frames established in 42 C.F.R. § 424.516(e).
>
>     \*   \*   \*
>
> I agree to notify the Medicare contractor of any future changes
> to the information contained in this application in accordance
> with the time frames established in 42 C.F.R. § 424.516(e).

*Id.*

22.    In addition to the initial and ongoing certifications, each time a provider submits a claim, electronically or otherwise, the submission must state, in boldface type, immediately preceding the claimant's signature:

(1)    **"This is to certify that the foregoing information is true, accurate, and complete."**

(2)    **"I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."**

42 C.F.R. § 455.18(a) (emphasis added).    Medicare Claims Processing Manual, Ch. 24 § 30.2 A, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf.

23.    For each individual claim for payment, Defendant BITG and other such healthcare providers must submit a CMS Form 1450, which reflects the name of the patient, the type of service provided, the total charges, and the date of the service.    CMS Form 1450 requires the provider to certify its understanding "that misrepresentation or falsification of essential information . . . requested by [the form] may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s)" and that the provider "did not knowingly or recklessly disregard or misrepresent or conceal material facts."    UB-04 Uniform Bill, CMS Form 1450

(03/01/2007),    *available*    *at*    https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP. pdf.

24.    Medicare consists of four parts, one of which,  Part B, covers a variety of services including medically necessary outpatient therapy, such as physical therapy services, under Sections 1861(g), 1861(p), 1861(s)(2)(D), and 1861(ll) of the Social Security Act.  42 U.S.C. §§ 1395x.

25.    Significantly, Medicare reimbursement is prohibited if the item or service is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).

26.    The Medicare Benefit Policy Manual specifies that services are only payable if the services "are or were required because the individual needed therapy services."  *Id.*, *see also* 42 C.F.R. § 424.24(c).  Additionally, "[t]o be covered[,] services must be skilled therapy services as described in this chapter and be rendered under the conditions specified. Services provided by professionals or personnel who do not meet the qualification standards, and services by qualified people that are not appropriate to the setting or conditions are unskilled services. . . . Services that do not meet the requirements for covered therapy services in Medicare manuals are not payable using codes and

descriptions as therapy services." Medicare Benefit Policy Manual, Chapter 15, Section 220.2A. Further, to be reasonable and necessary, "[t]he amount, frequency, and duration of the services must be reasonable under accepted standards of practice." *Id.* at Section 220.2B.

27. Outpatient physical therapy services must be "furnished by an individual meeting the qualifications in part 484 of this chapter for a physical therapist or an appropriately supervised physical therapy assistant." 42 C.F.R. § 410.60(a).

28. In private practice settings, appropriate supervision of physical therapy assistants requires direct supervision. Medicare Benefit Policy Manual, Chapter 15, Section 230.1C.

29. Even when appropriately supervised, the Medicare Benefit Policy Manual makes clear that physical therapy assistants "may not provide evaluative or assessment services, make clinical judgments or decisions; develop, manage, or furnish skilled maintenance program services; or take responsibility for the service." Instead, "[t]hey act at the direction and under the supervision of the treating physical therapist and in accordance with state laws." Medicare Benefit Policy Manual, Chapter 15, Section 230.1C.

30.    The Medicaid Program was also created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the financially needy, aged, blind, or disabled, and families with dependent children. *See* 42 U.S.C. §§ 1396-96w. Medicaid is funded by both federal and state governments (collectively, "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b, 1396d(b). Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals who qualify under its terms. At the federal level, Medicaid is administered by CMS. At the state level, each of the 50 participating states has a state agency to administer the program.

31.    Each state is permitted to design its own medical assistance plan, subject to CMS' parameters and HHS' approval.

32.    The Georgia Department of Community Health ("DCH") is responsible for the administration and supervision of the Medicaid program in Georgia. O.C.G.A. §§ 49-4-140, *et seq.,* grants DCH the authority "to establish such rules and regulations as may be necessary or desirable in order to execute the state plan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the state plan[.]" O.C.G.A § 49-4-

142(a). Georgia regulations authorize and require that DCH "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of services authorized under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated to providers enrolled in the applicable category of service, and amendments thereto are effective "as specified by the Department at the time of dissemination." *Id.*

33.    DCH has also partially delegated administration to Care Management Organizations ("CMOs"), which administer health plans and process and pay Medicaid claims to its contracted providers. In order to enroll as a provider with CMOs, the provider must also be enrolled with DCH as a Medicaid provider, certify compliance with Part I Policies and Procedures for Medicaid/PeachCare for Kids, and verify it had access to and understood all applicable Medicaid manuals and policies.

34.    Georgia Medicaid providers, such as Defendant BITG, submit claims for services rendered on behalf of Medicaid beneficiaries to DCH for payment, either directly or through a State designee, such as a fiscal intermediary ("Fee for Service Medicaid") or a CMO contractor.

35.    When submitting claims for payment, providers of services to Medicaid beneficiaries must identify, by provider number, who rendered the

service and, by code, what services were provided. Medicaid's fiscal intermediary, or its contractor CMO, uses these identifying numbers and codes to determine whether a claim should be paid and, if so, how much.

36. All Georgia Medicaid providers wishing to submit claims electronically rather than on paper must complete an Electronic Funds Transfer Agreement through which the provider agrees to the following requirements:

> Legal Compliance. Provider shall abide by all federal and state laws governing the Medicaid program.
>
> \*     \*     \*
>
> Provider further acknowledges and agrees that only Payees who have agreed in writing to: 1) comply with all Department policies regarding the payment of medical assistance; and 2) be subject to the recoupment policies outlined in the Provider's Statement of Participation and as set forth in the Power of Attorney for Electronic Claims Submission, shall be deemed acceptable Payees.
>
> \*     \*     \*
>
> Provider certifies by such acceptance [of funds] that Provider presented the claims for the services . . . and that the services were rendered by or under the supervision of Provider. Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws.

Georgia DCH Electronic Funds Transfer Agreement.

37.    In order to receive payment for Medicaid services, a physical therapy provider such as BITG must first enroll in the Georgia Medicaid program. The provider must enter into an agreement with the State called a "Statement of Participation," commonly referred to as a Provider Agreement, the express terms of which include, but are not limited to, the following:

Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II, and the applicable Part III manuals. ¶ 2(A).

Claims Submissions: Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness . . . . ¶ 2(B)(4)(A).

Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents, medical records, identifying recipient data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided. ¶ 2(B)(4)(B).

Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of services indicated in the Provider Enrollment documents. By submitting claims for reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims. ¶ 2(B)(4)(C).

> Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered . . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered . . . for which federal financial participation is not available. ¶ 2(B)(4)(D).

> Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup, or recover payments as a result of Provider's failure to abide by the Department's requirements. ¶ 2(B)(4).

Georgia DCH Division of Medical Assistance, Statement of Participation, DMA-002 (Rev. 04/03).

38.    The Part I Medicaid/PeachCare for Kids Manual (hereinafter, "Part I Manual") is applicable to all providers.  In addition, providers are bound by the terms of the Part II Manual that are applicable to the services provided.

39.    The Part I Manual, "[a]long with the Statement of Participation, [ ] encompasses the terms and conditions for receipt of reimbursement." Georgia DCH, Part I Policies and Procedures for Medicaid/PeachCare for Kids, at "Preface" (April 1, 2013). The Part I Manual reiterates and reemphasizes the importance Georgia places on compliance and further spells out the specific

conditions it places on providers submitting claims. For example, according to the Part I Manual, each enrolled provider must:

> "Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services [*Id.* at R. 106(B), p. I-18];"

> "Not engage in any act or omission that constitutes or results in over utilization of services [*Id.* at R. 106(G), p. I-19];"

> "Neither bill the Division for any services not performed or delivered in accordance with all applicable policies [*Id.* at R. 106(J), p. I-19];" and

> "Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice [*Id.* at R. 106(K), p. I-19]."

40.    At all times relevant to the Complaint, Defendants were subject to the conditions set out in the DCH Part I Manual and applicable Part II Manuals.

41.    Claims submitted by Defendant BITG and other such healthcare providers for treatment provided to Medicaid beneficiaries must contain an identifying provider number representing who rendered the service and identifying codes representing what services they provided. Medicaid's fiscal intermediaries, or its contractor CMOs, use these identifying provider numbers and service codes to determine whether to pay a claim and, if so, how much to pay.

42.    The applicable Part II Manuals impose even more stringent requirements for physical therapy providers participating in its programs. For

example, under the Children's Intervention Services Program, Georgia Medicaid only reimburses for medically necessary physical therapy services. Among the conditions for reimbursement is a requirement that services be rendered by "qualified providers," defined as those "currently licensed in the State of Georgia as . . . physical therapists." Therefore, providers not licensed in the state of Georgia rendering physical therapy services to Medicaid beneficiaries are not entitled to receive Medicaid reimbursement. DCH, Part II Policies and Procedures for Children's Intervention Services, at R.601 (April 1, 2018).

43. Further, in a group practice, hospital, or agency, the Part II Manual requires "each provider [to] enroll separately and bill for services directly provided under their own provider number." The Part II Manual specifically prohibits "[i]ndiscriminate billing under one provider's name or provider number without regard to the specific circumstances of rendition of the services," a practice that "will be grounds for adverse action." *Id.* at R.602.

44. The Part II Manual also requires all physical therapy providers enrolled in the Children's Intervention Services category to:

> "Bill the Division the procedure code(s) which best describes the level and complexity of service rendered [R.603.7];" and

> "Maintain written documentation of all services provided to members for a minimum of five (5) years after the date of service [R.603.9]."

18

45.     Further, the Part II Manual expressly states that the following services

are not covered by Georgia Medicaid:

> "Services which are provided in a manner which is non-
> compliant or inconsistent with the provisions of this manual
> [R.904(J)];"

> "Services provided by individuals other than the enrolled
> licensed practitioner of the healing arts.  Note:  OTA, PTA,
> Students, etc. are not allowed to provide services under the CIS
> Program [R.904(M)];" and

> "Group therapy [R.904(P)]."

### The Federal False Claims Act

46.     The federal FCA imposes liability upon any person who: "knowingly

presents, or causes to be presented [to the Government] a false or fraudulent claim

for payment or approval;" or "knowingly makes, uses or causes to be made or

used, a false record or statement to get a false or fraudulent claim paid or

approved."  31 U.S.C. § 3729(a)(1) and (2).  Any person found to have violated

these provisions is liable for a civil penalty of at least $11,181 and up to $22,363

for each such false or fraudulent claim, plus three times the amount of the damages

sustained by the Government. *Id.*; 28 C.F.R. § 85.5 (setting civil penalties).

47.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

48.    The FCA broadly defines a "claim" as one that "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

49.    False or fraudulent bills or other requests for payment, or reimbursement from Government Programs have routinely been found to constitute "claims" giving rise to liability under the FCA. *See, e.g., Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

50.    The Supreme Court of the United States has stated that Congress intended that the FCA be broadly applied to protect government funds and property from fraudulent claims. *See, e.g., United States v. Niefert-White Company,* 390 U.S. 228 (1968).

51.    The FCA empowers private persons having information regarding a

false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The FCA contains anti-retaliation provisions, which prohibit an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations." 31 U.S.C. § 3730(h)(1). The relief available to an employee under this provision is two times the amount of back pay plus interest, reinstatement with the same seniority status, and compensation for any special damages, including litigation costs. 31 U.S.C. § 3730(h)(2).

## <u>The Georgia False Medicaid Claims Act</u>

52.     The Georgia FMCA, O.C.G.A. §§ 49-4-168, *et seq.*, states that any person who:

> (1)     Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
>
> (2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> *     *     *
>
> (7)     Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit property or money to
the Georgia Medicaid program,

shall be liable to the State of Georgia for a civil penalty
consistent with the civil penalties provision of the federal False
Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil
Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461;
Public law 101-410), and as further amended by the federal
Civil Penalties Inflation Adjustment Improvements Act of 2015
(Sec. 701 of Public Law 114-74), plus three times the amount
of damages which the Georgia Medicaid program sustains
because of the act of such person.

O.C.G.A. § 49-4-168.1 (a)(l)-(3) (2018).

53.    Under subparagraph two of O.C.G.A. § 49-4-168, "knowing" and

"knowingly" require no proof of specific intent to defraud and mean that a person,

with respect to information:

      **(A)**    Has actual knowledge of the information;

      **(B)**    Acts in deliberate ignorance of the truth or falsity of the
information; or

      **(C)**    Acts in reckless disregard of the truth or falsity of the
information.

54.    The statute defines "material" as "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or

property." O.C.G.A. § 49-4-168(3).

55.    The statute defines "claim" as:

22

any request or demand, whether under a contract or otherwise, for money, property, or services, which is made to the Georgia Medicaid program, or to any officer, employee, fiscal intermediary, grantee or contractor of the Georgia Medicaid program, or to other persons or entities if it results in payments by the Georgia Medicaid program, if the Georgia Medicaid program provides or will provide any portion of the money or property requested or demanded, or if the Georgia Medicaid program will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded. A claim includes a request or demand made orally, in writing, electronically, or magnetically. Each claim may be treated as a separate claim.

O.C.G.A. § 49-4-168(1).

## RELEVANT FACTS

### Background

56.    The majority of the events at issue occurred at 4754 Martin Road, Suite 200, Flowery Branch, Georgia, where Defendant Brendon Blake operates BITG's main office, and 2300 Liam Avenue, Suite 104, Dacula, Georgia, where Defendant Brendon Blake operates BITG's secondary office.

57.    Relator worked as the Business Operations Manager at BITG from May 2012 until Defendant Brendon Blake terminated her employment on September 4, 2017.

58.    Throughout her employment, Relator was under the direct supervision and control of Defendant Brendon Blake.

59.     As a part of her employment, Defendant Brendon Blake instructed Relator to manage most aspects of Defendant BITG's offices, which included, but was not limited to, reviewing and submitting Defendant BITG's bills according to Defendant Brendon Blake's instructions.

60.     Relator also managed most day-to-day concerns at Defendant BITG, including, but not limited to, overseeing the flow of appointments, dealing with patient complaints, and resolving billing issues.

61.     Relator witnessed Defendant Brendon Blake's numerous methods of engaging in billing fraud, which included, but was not limited to, billing for services not rendered, upcoding for services provided, and billing the Government for services provided by unqualified personnel.

62.     On multiple occasions, Relator attempted to convince Defendant Brendon Blake to stop engaging in fraudulent activities; however, Defendant Brendon Blake refused and continued to engage in rampant fraud throughout Relator's employment.

63.     On September 4, 2017, due to Relator's frequent disagreements about Defendant Brendon Blake's conduct and Defendant BITG's policies, Defendant Brendon Blake abruptly terminated Relator's employment.

64.     On information and belief, Defendants continue to engage in multiple types of fraudulent activities.

**Fraudulent Activities**

65.     In May, 2012, Relator was hired by Defendant Brendon Blake as the Business Operations Manager for Defendant BITG. Shortly afterwards, Relator learned that Defendant Brendon Blake had instituted multiple schemes to defraud the Government.

66.     Defendant Brendon Blake engaged in multiple schemes to fraudulently increase the amounts Defendant BITG could bill Government Programs, which ranged from straightforward billing fraud and upcoding to dangerous practices that put the health and safety of patients at risk.

67.     Approximately half, if not more, of Defendant BITG's patients are beneficiaries of Government Programs at any given time.

68.     First, in order to maximize potential profits, Defendant Brendon Blake instructed Relator and other employees to schedule as many patients as possible in a given day.

69.     In order to render treatment for this large number of patients, Defendant Brendon Blake would provide little to no initial care and then order the patients to take part in group exercises and treatments, thereafter ordering Relator

and other employees to always use Individual Billing Codes instead of Group Billing Codes when requesting reimbursement.

70.    Individual Billing Codes may only be used when treating a single patient at a time. Government Programs reimburse individual treatment at a higher rate than group treatment because of the increased time and skill required.

71.    The following examples are demonstrative of Defendants' fraudulent practices:

- On April 17, 2014, Defendant Brendon Blake scheduled at least 16 patients for hour-long treatment sessions; 9 patients were scheduled between 1:00 PM and 3:00 PM. Most of these treatments were billed to Government Programs using the Individual Billing Code;

- On April 30, 2014, Defendant Brendon Blake scheduled at least 25 patients for hour-long treatment sessions; 6 patients were scheduled between 1:00 PM and 3:00 PM. Most of these treatments were billed to Government Programs using the Individual Billing Code; and

- On May 20, 2014, Defendant Brendon Blake scheduled at least 16 patients for hour-long treatment sessions; 8 patients were scheduled between 1:00 PM and 3:00 PM. Most of these treatments were billed to Government Programs using the Individual Billing Code.

- On October 16, 2017, Defendant Brendon Blake scheduled at least 42 patients for hour-long treatment sessions; 14 patients were scheduled between 2:00 PM and 4:00 PM. Most of these treatments were billed to Government Programs using the Individual Billing Code.

*See* Exhibit 2.

72.   Group Billing Codes are required to be used when treating multiple patients at a time. Government Programs reimburse group treatment at a lower rate than individual treatment because a single provider can render treatment for multiple patients at once.

73.   The following are examples of Medicare reimbursement rates during the relevant time period:

- The Individual Billing Code for Therapeutic Exercises (97110) was $60.00;

- The Individual Billing Code for an Initial Evaluation (97001) was $141.00;

- The Individual Billing Code for Manual Therapy (97140) was $55.00; and

- The Individual Billing Code for Electrical Stimulation (G0283) was $39.00.

- However, if any other patient is being treated simultaneously by the same health care provider, the Group Billing Code (97150) must be used. The Group Billing Code was $35.00.

74.    By using Individual Billing Codes instead of Group Billing Codes, Defendant Brendon Blake was able to greatly increase Defendant BITG's profits by defrauding Government Programs.

75.    In order to comply with the regulations of Government Programs, Defendants may only use Individual Billing Codes when treating a single patient at a time and are required to use Group Billing Codes when treating more than one patient at a time.

76.    Second, in order to conceal the high volume of patients for which Defendant BITG was billing Government Programs, Defendant Brendon Blake instructed Relator and other employees to submit bills under Defendant Gina Blake's name, physical therapy license, and/or National Provider Identifier ("NPI").

77.    However, Relator never witnessed Defendant Gina Blake perform any therapies or treatments on patients at BITG. Defendant Gina Blake was rarely, if ever, at either BITG location, despite the fact that numerous bills were submitted under her name, license, and/or NPI.

78.    The following examples are demonstrative of Defendants' fraudulent practices:

- On June 29, 2012, Medicare patient "J.W." received treatment at BITG. Defendant Gina Blake signed the Daily Note/Billing Sheet, claiming to have provided treatment. However, Defendant Gina Blake did not treat J.W. Defendant BITG fraudulently billed Medicare for J.W.'s treatment under Defendant Gina Blake's NPI despite the fact that she did not provide the services;

- On August 13, 2012, and September 10, 2012, Medicare patient "J.M." received treatment at BITG. Defendant Gina Blake signed the Daily Note/Billing Sheet, claiming to have provided treatment. However, Defendant Gina Blake did not treat J.M. Defendant BITG fraudulently billed Medicare for J.M.'s treatment under Defendant Gina Blake's NPI despite the fact that she did not provide the services;

- On April 3, 17, and 30, 2014, Medicare patient "G.C." received treatment at BITG. Defendant Gina Blake signed the Daily Note/Billing Sheet, claiming to have provided treatment. However, Defendant Gina Blake did not treat G.C. Importantly, Defendant

29

<u>Brendon Blake's patient schedules for April 17 and 30, 2014, clearly</u> <u>indicate he is the therapist scheduled to treat patient G.C. on those</u> <u>days.</u> (*See* Exhibit 2.) Defendant BITG fraudulently billed Medicare for G.C.'s treatment under Defendant Gina Blake's NPI despite the fact that she did not provide the services;

- On April 7 and 21, 2014, Medicare patient "C.E." received treatment at BITG. Defendant Gina Blake signed the Daily Note/Billing Sheet, claiming to have provided treatment. However, Defendant Gina Blake did not treat C.E. Defendant BITG fraudulently billed Medicare for C.E.'s treatment under Defendant Gina Blake's NPI despite the fact that she did not provide the services; and

- On May 20, 2014, Medicare patient "M.W." received treatment at BITG. Defendant Gina Blake signed the Daily Note/Billing Sheet, claiming to have provided treatment. However, Defendant Gina Blake did not treat M.W. <u>Importantly, Defendant Brendon Blake's patient</u> <u>schedule for May 20, 2014, clearly indicates he is the therapist</u> <u>scheduled to treat patient M.W. on that day.</u> (*See* Exhibit 2.) Defendant BITG fraudulently billed Medicare for M.W.'s treatment

under Defendant Gina Blake's NPI despite the fact that she did not

provide the services.

*See* Exhibit 1.

79.   In addition, during Relator's employment at BITG, Defendant
Brendon Blake terminated a physical therapist working at BITG's Gainesville,
Georgia branch located in the Smoky Springs Adult Living Facility and billed all
of the therapist's pending treatment as if provided by him.  However, Defendant
Brendon Blake did not treat those patients.  Defendant BITG fraudulently billed
Medicare for those patients' treatment under Defendant Brendon Blake's NPI,
despite the fact that he did not provide the services.

80.   In order to comply with the regulations of Government Programs,
Defendants are required to submit billing records and reimbursement requests that
accurately identify the health care provider who actually rendered the billed-for
treatment.

81.   Third, in order to keep pace with the high volume of patients,
Defendant Brendon Blake hired over ten unqualified employees ("UEs") to
provide medical therapies and treatments for patients.

82.   The UEs possessed no medical training or certifications whatsoever
and should not have been allowed near patients in any medical capacity.

83.    Nevertheless, in order to see as many patients as possible and to maximize profits by avoiding the cost of hiring accredited employees, Defendant Brendon Blake instructed the UEs to provide physical therapy and other forms of medical procedures to patients.

84.    As the number of patients increased, Defendant Brendon Blake instructed the UEs to provide more and more difficult and potentially dangerous procedures. Relator observed UEs supervising and directing patients on physical exercises and the use of stem machines and laser ultrasound procedures. All of these treatments were required to be provided by licensed therapists and should not have been billed as if they were.

85.    The following examples are demonstrative of Defendants' fraudulent practices:

- From approximately 2016 until 2018, Alexis Kent was employed by Defendant BITG and provided medical therapies and treatment to BITG patients. At the time she was hired, Alexis was 16 years old, had no medical training or experience, and was not qualified to treat patients.

- From approximately 2011 until 2013, Emily Roth was employed by Defendant BITG and provided medical therapies and treatment to

BITG patients. At the time she was hired, Emily was 17 years old, had no medical training or experience, and was not qualified to treat patients.

- From approximately 2015 until 2017, Jenna Allen was employed by Defendant BITG and provided medical therapies and treatment to BITG patients. At the time she was hired, Jenna was 17 years old, had no medical training or experience, and was not qualified to treat patients.

- From approximately 2016 until 2017, Holly Hughes was employed by Defendant BITG and provided medical therapies and treatment to BITG patients. At the time she was hired, Holly was 17 years old, had no medical training or experience, and was not qualified to treat patients.

- From approximately 2015 until 2017, Lauren Tatum was employed by Defendant BITG and provided medical therapies and treatment to BITG patients. At the time she was hired, Lauren was 17 years old, had no medical training or experience, and was not qualified to treat patients.

86.    The aforementioned UEs provided various treatments to patients, including, but not limited to: instructing patients how to perform exercises, which Defendant BITG billed as CPT Code 97110, Therapeutic Exercises; placing and operating electrical stimulation pads on patients without supervision, which Defendant BITG billed as CPT Code G0283, Electrical Stimulation; and other forms of physical therapy, which Defendant BITG billed as CPT Code 97112, Neuromuscular Reeducation.

87.    By employing UEs and allowing them to provide medical treatment, Defendant Brendon Blake endangered the health and well-being of Defendant BITG's patients.

88.    In order to comply with the regulations of Government Programs, Defendants are required to provide medical treatment only through licensed medical providers, who are qualified to render the billed-for treatment.

89.    Fourth, in order to induce patients to return, Defendant Brendon Blake instructed Relator and other employees to automatically waive Government Program copays.

90.    Defendant Brendon Blake was concerned that his patients would be less likely to return and/or would seek fewer physical therapy treatments if they

were required to pay their copays at each visit. Government Program copays ranged from $20 to $65.

91.    To ensure that patients were not charged copays, Defendant Brendon Blake instructed Relator and other BITG employees to put explicit notes in patient files stating "NO COPAY."

92.    In order to comply with regulations of Government Programs, Defendants are required to charge and collect a copay from Government Program beneficiaries and may not waive a copay in order to induce patients to return for treatment.

93.    Fifth, Defendant BITG's Flowery Branch office was the only location credentialed to bill Government Programs for treatment provided to its beneficiaries.

94.    In order to bill for additional patients, Defendant Brendon Blake instructed Relator and other BITG employees to bill treatments provided at BITG's Dacula location as if provided at the Flowery Branch location.

95.    Defendant Brendon Blake treated patient "K.J." at BITG's Dacula location on March 15, 18, 22, and 25, 2016, and fraudulently billed a Government Program for K.J.'s treatment as if provided at BITG's credentialed Flowery Branch location. *See* Exhibit 3.

96.    In order to comply with regulations of Government Programs, Defendants are required to only bill for services provided at accredited facilities and may not bill for treatments provided at non-accredited locations.

97.    In taking the actions set forth in this Complaint, Defendants violated the federal FCA, 31 U.S.C. §§ 3729, *et seq.*; the Georgia FMCA, O.C.G.A. §§ 49-4-168, *et seq.*; and applicable professional guidance and ethics rules.

## COUNT ONE
## SCHEME TO SUBMIT FRAUDULENT CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

98.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

99.    By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

100.    Defendants submitted bills to the Government for payment and retained improperly obtained payments arising from their physical therapy services.  All such false claims were knowingly submitted to obtain payment or approval by the Government of the false or fraudulent claims.

101.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and

the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT TWO
### SUBMISSION OF CLAIMS CONTAINING
### FALSE EXPRESS OR IMPLIED CERTIFICATIONS
### (31 U.S.C. § 3729(a)(1)(B))

102.  All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

103.  By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, false certifications and representations made or caused to be made by Defendants— material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

104.  By submitting claims for payment and retaining improperly obtained payments, Defendants expressly and impliedly, if falsely, certified their compliance with the relevant Government and CMS regulations authorizing such payments.

105.  As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and

every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT THREE**
**FALSE RECORDS FOR PAYMENT**
**(31 U.S.C. § 3729(a)(1)(B))**

106.  All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

107.  Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for physical therapy services rendered.  All such false records or statements were knowingly made and material to the Government to get false or fraudulent claims paid or approved by the Government.

108.  Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

109.  As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT FOUR
## FALSE CLAIMS CONSPIRACY
## (31 U.S.C. § 3729(a)(1)(C))

110.  All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

111.  Defendants entered into a conspiracy or conspiracies through their employees and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for the provision of physical therapy services.

112.  As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT FIVE
## REVERSE FALSE CLAIMS
## (31 U.S.C. § 3729(a)(1)(G))

113.  All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

39

114. By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or false statements that are material to an obligation to pay, transmit, or return money to the Government.

115. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT SIX
## GEORGIA FALSE MEDICAID CLAIMS ACT
## (O.C.G.A. §§ 49-4-168, *et seq.*)

116. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

117. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia Medicaid Program for payment or approval.

118. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims.

119.  By virtue of the acts described herein, Defendants conspired to violate the Georgia FMCA and to defraud the Georgia Medicaid Program by getting a false or fraudulent claim allowed or paid.

120.  The Georgia Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

121.  Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their obligations to return overpayments of Georgia state funds.

122.  By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123.  Pursuant to O.C.G.A. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus civil penalties of at least $11,181 and up to $22,363 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, on each of these claims, Relator requests the following relief be ordered:

### **As to the Federal Claims:**

A.     Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $22,363 for each false or fraudulent claim or such other penalty as the law may permit and/or require for each violation of the FCA;

B.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

C.     Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law;

D.     Relator be awarded such other and further relief as the Court may deem to be just and proper;

## As to the State Claims:

E.     Pursuant to O.C.G.A. §49-4-168.1, Defendants pay an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $22,363 for each false or fraudulent claim or such other penalty as the law may permit and/or require for each violation of the Georgia FMCA;

F.     Relator be awarded the maximum amount allowed pursuant to O.C.G.A. § 49-4-168.2  of the Georgia FMCA and/or any other applicable provision of law;

G.     Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by O.C.G.A. § 49-4-168.2  and any other applicable provision of the law;

H.     Relator be awarded such other and further relief as the Court may deem to be just and proper;

## As to All Claims:

I.     Defendants cease and desist from further violations of the FCA and Georgia FMCA as set forth above;

J.     Defendants be excluded from future participation in Government Programs;

K.    Plaintiffs be awarded pre- and post-judgment interest on the awards

ordered herein; and

## **DEMAND FOR JURY TRIAL**

Relator hereby demands a trial by jury as to all issues so triable.


Respectfully submitted this 22nd day of October, 2018.

> */s/ Michael J. Moore*
> MICHAEL J. MOORE
> Georgia Bar No. 520109
> AIMEE J. HALL
> Georgia Bar No. 318048
> ELIZABETH S. WHITE
> Georgia Bar No. 258844
> POPE, MCGLAMRY, KILPATRICK,
> MORRISON & NORWOOD, P.C.
> 3391 Peachtree Road, NE, Suite 300
> P.O. Box 191625 (31119-1625)
> Atlanta, GA  30326
> (404) 523-7706
> efile@pmkm.com
>
> ROBERT A. MAGNANINI*
> New Jersey Bar No. 017221993
> ALEX BARNETT-HOWELL*
> New Jersey Bar No. 140132015
> STONE & MAGNANINI, LLP
> 100 Connell Drive, Suite 2200
> Berkeley Heights, NJ 07922
> (973) 218-1111
> rmagnanini@stonemagnalw.com
> ahowell@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*

\* *Pro Hac Vice* Motion anticipated